**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re TIMOTHY D. KRAUSE, CECILIA S. KRAUSE, and NEVELCO, INC., an Illinois corporation, | ) ) ) ) | |
| Debtors. | ) ) ) | Case No. 14 C 4317 |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, | ) ) ) | |
| Plaintiff/Appellee, | ) ) | Bankruptcy Case No. 13-B-15811 Adversary No. 13 A 0901 |
| v. | ) ) | |
| TIMOTHY D. KRAUSE, CECILIA S. KRAUSE, and NEVELCO, INC., an Illinois corporation, | ) ) ) | |
| Defendants/Appellants. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Pursuant to 28 U.S.C. § 158(a), Defendants/Appellants appeal from the judgment that the Bankruptcy Court entered in the underlying adversary action on April 30, 2014, in favor of Plaintiff/Appellee finding a debt in the amount of $714,822.75 non-dischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(6). The Court has jurisdiction over the present appeal pursuant to 28 U.S.C. § 158. *See also* Fed.R.Bankr.P. 8002. For the following reasons, the Court affirms the Bankruptcy Court's judgment.

**PROCEDURAL BACKGROUND**

On April 16, 2013, Nevelco, Inc. ("Nevelco"), an Illinois corporation, filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Northern District of Illinois. Also on April 16, 2013, Defendant/Appellants Timothy D. Krause and Cecilia S. Krause

(collectively "the Krauses") filed joint voluntary Chapter 7 petitions. Plaintiff/Appellee National Union Fire Insurance Company of Pittsburgh ("National Union") filed its Adversary Complaint to determine dischargeability of debt on June 6, 2013. After a bench trial, on April 30, 2014, the Bankruptcy Court issued its Memorandum Opinion concluding that the debt owed to National Union was nondischargeable under 11 U.S.C. § 523(a)(2)(A) and § 523(a)(6). On May 12, 2014, the Krauses filed a notice of appeal, and on May 13, 2014, National Union filed a motion to modify the April 30, 2014, Memorandum Order. The Bankruptcy Court entered a one-page Amended Order clarifying that the judgment included costs and reasonable attorney's fees on June 17, 2014.

## FACTUAL BACKGROUND

The following facts are taken from the April 16, 2014, bench trial transcript, the trial exhibits, and the parties' stipulated facts. In 1999, the Krauses formed Nevelco as a general contracting business. Nevelco would purchase vacant lots, build homes on the property, and then sell them for a profit. The Krauses each owned 50% of Nevelco — Timothy was the president and Cecilia was the secretary and company bookkeeper. Cecilia handled the bills, credits and deposits, and balanced the checkbook. Timothy handled the field work and supervised the subcontractors.

On September 10, 2004, Nevelco purchased a vacant lot at 205 S. Maple Street in Itasca, Illinois ("Itasca Property") for the purpose building a home on the property, and thereafter, selling it for a profit. The Krauses did not intend to live at the Itasca Property. The Krauses originally obtained a short-term loan in the amount of $570,000 from Itasca Bank & Trust ("Itasca Bank") to finance the construction costs. In 2004, Nevelco conveyed the Itasca Property

to a land trust of which Itasca Bank was the trustee and Nevelco the beneficiary.

Because the Itasca Bank loan was a short-term construction loan, the Krauses refinanced the loan amount. Specifically, in November 2005, the Krauses completed a loan application, namely, the "Uniform Residential Loan Application," to refinance the construction loan with Washington Mutual Bank ("Washington Mutual"). On the loan application, the Krauses identified themselves individually and signed as the "borrowers" listing their personal assets and liabilities. Further, the Krauses indicated that they intended to occupy the Itasca Property as their primary residence. The refinancing closed on November 8, 2005, and the loan amount was $562,500. Both Timothy and Cecilia signed the adjustable rate promissory note ("the Note") as trustees and as individuals. The Krauses, however, were not trustees to the Itasca Bank land trust. The Note signed by the Krauses for the Washington Mutual loan included a "due-on-sale" clause that stated in relevant part:

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without the Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.

The Krauses signed the thirty-year mortgage and two riders as trustees, and the TILA disclosure statement and November 15, 2005, payoff letter to the Itasca Bank as individuals. It is undisputed that neither the title insurer nor Washington Mutual recorded the mortgage.

Nevelco completed the construction on the Itasca Property house in March 2006 and the Krauses put the house and lot up for sale. Scott and Colleen Becker purchased the home from Nevelco for $805,000. The closing of the Itasca Property took place on March 13, 2006, at which Timothy Krause and his lawyer attended. In connection with the sale and closing,

Timothy signed the closing documents in multiple capacities: (1) he signed the sales contract as Nevelco's president; (2) he signed the HUD-1 Settlement Statement on behalf of Itasca Bank as trustee; and (3) he signed the Direction to Convey as Nevelco's president.

At no time did the Krauses inform Washington Mutual of their intent to sell the Itasca Property. Nevertheless, on the HUD-1 Settlement Statement related to the Becker sale, Timothy certified that the various disclosures were "true and accurate." Also, the Krauses left the line items for existing loans and "payoff of first mortgage loan" blank. The Trust Officer from Itasca Bank signed the ALTA form stating there were no "unrecorded leases, easements or other servitudes to which the land or building, or portions thereof are subject" based on information the Krauses provided him.

The Krauses did not pay the approximately $563,000 they owed Washington Mutual on the Itasca Property Note at the Becker closing. Instead, Timothy left the March 2006 closing with a check in the amount of $790,367.71, rather than the expected $230,000. On March 14, 2006, Timothy deposited the check for $790,367.71 into a Nevelco account at Itasca Bank. On March 16, 2006, the Krauses transferred $460,000 to an A.G. Edwards account in the name of "Timothy D. Krause Real Estate 2 Acct" that listed the Krauses' home address as the account address.

Moreover, the Krauses continued paying on the Washington Mutual Note through February 2009 and defaulted in March 2009. Washington Mutual's successor, JPMorgan Chase, did not learn of the 2006 Itasca Property sale until after the Krauses defaulted on the Note in 2009. Prior to the default, there were sufficient funds in Nevelco's accounts at Itasca Bank to pay off the Washington Mutual loan.

After learning of the default in 2009, JPMorgan Chase brought a claim against Stewart Title Guaranty Co. ("Stewart Title"), with which Washington Mutual had contracted to insure the title and conduct the 2005 re-financing closing. In turn, Stewart Title contracted with Specialty Title Services, Inc. ("Speciality Title") to conduct the closing and handle the filing of the documents. Stewart Title then settled its claim with JPMorgan Chase and brought a claim against Speciality Title. Plaintiff/Appellee National Union is the liability insurer of Specialty Title. National Union paid the claim brought against Specialty Title and succeeded to its rights as subrogee. Thus, National Union holds the rights under the Note executed by the Krauses in November 2005.

## DISCHARGEABILITY PROCEEDINGS

On June 21, 2013, National Union filed its adversary action in the Northern District of Illinois Bankruptcy Court to determine the dischargeability of the Krauses' obligation under the Washington Mutual Note. In Count I of the Complaint, National Union sought a finding of non-dischargeability based on false representations pursuant to 11 U.S.C. § 523(a)(2)(A). In Count II, National Union sought relief under 11 U.S.C. § 523(a)(6) based on the common law tort of conversion. National Union specifically sought recovery of the amounts due under the Note, which the parties stipulated as $714,822.25.

As to Count I, the bankruptcy judge concluded that the March 2006 sale of the Itasca Property triggered the lender's legal right to accelerate the loan. The court also found that the Krauses made false representations by telling Washington Mutual that they intended to use the loan proceeds to build a house in which they would live, failing to inform Washington Mutual that they sold the Itasca Property, and failing to disclose the outstanding Note and mortgage to

5

the title insurer and other entities at the March 2006 closing.

As to Count II, the Bankruptcy Court concluded that the evidence established a willful and malicious conversion under § 523(a)(6) because the Krauses' retention of the proceeds after the Becker sale was unauthorized and constituted a wrongful assumption of control over the proceeds that should have gone to Washington Mutual.  Also, the Bankruptcy Court concluded that the Krauses' conversion was accomplished through deliberate, purposeful conduct.

## STANDARD OF REVIEW

On appeal from the bankruptcy court, "the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Fed.R.Bankr.P. 8013; *Mungo v. Taylor,* 355 F.3d 969, 974 (7th Cir. 2004). "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed.R.Bankr.P. 8013; *see also First Weber Group, Inc. v. Horsfall,* 738 F.3d 767, 776 (7th Cir. 2013) (reviewing courts "must be especially deferential toward a trial court's assessment of witness credibility."). Accordingly, the Court reviews the bankruptcy court's findings of fact for clear error and its legal conclusions de novo. *See In re Mississippi Valley Livestock, Inc.,* 745 F.3d 299, 302 (7th Cir. 2014). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Herman,* 737 F.3d 449, 452 (7th Cir. 2013) (citation omitted).  Under the clearly erroneous standard, if there are two permissible views of the facts, a court's choice between them cannot be clearly erroneous. *See First Weber Group, Inc.,* 738 F.3d at 776.

## ANALYSIS

The purpose of the Bankruptcy Code "is to provide equitable distribution of the debtor's assets to the creditors and 'to relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.'" *Village of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002) (citation omitted); *see also Jendusa-Nicolai v. Larsen,* 677 F.3d 320, 324 (7th Cir. 2012) (a "principal purpose of the Bankruptcy Code is to grant a fresh start to the *honest but unfortunate debtor.*") (emphasis in original) (citation omitted). Courts apply a presumption in favor of discharge in bankruptcy, although the Bankruptcy Code also provides certain exceptions to this general rule. *See In re Cohen,* 507 F.3d 610, 612-13 (7th Cir. 2007). A "bankruptcy court applies a preponderance of the evidence standard when making dischargeability determinations under § 523(a)." *Ojeda v. Goldberg,* 599 F.3d 712, 716 (7th Cir. 2010). In other words, because bankruptcy courts "apply a presumption in favor of discharge in bankruptcy, the creditor bears the burden to demonstrate by a preponderance of the evidence that the exception applies." *In re Cohen,* 507 F.3d at 613.

### I.      Count I — False Representations under 11 U.S.C. § 523(a)(2)(A)

"Under § 523(a)(2)(A), a debtor's debt may not be discharged if the debt was for money and property obtained by false pretenses, false representations, or actual fraud." *Gambino v Koonce,* 757 F.3d 604, 607 (7th Cir. 2014). In its Complaint, National Union based its § 523(a)(2)(A) claim on the Krauses' false representation regarding the Washington Mutual mortgage on the Itasca Property. *See In re Aguilar,* 511 B.R. 507, 512 (Bankr. N.D. Ill. 2014) ("11 U.S.C. § 523(a)(2)(A) sets forth three separate grounds for dischargeability"). To establish

this exception from discharge, National Union was required to show that: (1) the Krauses made a false representation or omission, which they either knew was false or made with reckless disregard for the truth; (2) the Krauses possessed an intent to deceive or defraud; and (3) Washington Mutual justifiably relied on the false representation. *See In re Davis,* 638 F.3d 549, 553 (7th Cir. 2011); *Ojeda*, 599 F.3d at 716-17. The Court turns to each § 523(a)(2)(A) requirement.

### A. False Representations and Omissions

In its April 30, 2014, Memorandum Opinion, the Bankruptcy Court concluded that the Krauses' failure to inform their attorney, Washington Mutual, the Beckers, or the title insurance company's closing agent that there was an outstanding mortgage on the Itasca Property when the Krauses sold the property constituted a false omission. *See In re Glenn,* 502 B.R. 516, 530 (Bankr. N.D. Ill. 2013) ("debtor's silence regarding a material fact can constitute a false representation under § 523(a)(2)(A)") (citation omitted). The bankruptcy judge further relied upon the Krauses' false misrepresentation made in the mortgage application that they intended to build a house with the loan proceeds in which they would live, when in fact, they had no intention of living there, but intended to sell the house and lot for a profit.

Here, the Krauses do not take issue with the Bankruptcy Court's reliance on their failure to inform Washington Mutual and the other entities about the 2005 mortgage on the Itasca Property. Instead, they argue that because National Union did not base its § 523(a)(2)(A) claim on the misrepresentation in the mortgage application, namely, that they intended to live in the house built on the Itasca Property, the Bankruptcy Court somehow erred. This first argument is unavailing because bankruptcy judges are not prohibited from reviewing the entire record when

8

making their factual findings. *See, e.g., In re Glenn,* 502 B.R. at 522; *In re Hernandez,* 493 B.R. 46, 54 (Bankr. N.D. Ill. 2013); *In re Mateyko*, 437 B.R. 313, 319 (Bankr. N.D. Ill. 2010). Further, in reviewing the bankruptcy judge's decision, it is not err for this Court to look to the entire record. *See Stamat v. Neary,* 635 F.3d 974, 979 (7th Cir. 2011). Indeed, "reviewing courts should look to *all* the evidence in the record in determining whether a factual finding is clearly erroneous." *Matter of Love,* 957 F.2d 1350, 1362 (7th Cir. 1992) (emphasis in original). Therefore, the Bankruptcy Court did not err in relying upon the Krauses' 2005 Uniform Residential Loan Application and this Court can consider the misrepresentation in the loan application in affirming the Bankruptcy Court.

The Krauses also argue that the bankruptcy judge's reliance on the misrepresentation in the mortgage application is clearly erroneous because the occupancy requirement was deleted in a rider to the mortgage. To clarify, the actual mortgage referenced an occupancy requirement and a rider to the mortgage allowed for the deletion of the occupancy requirement if Washington Mutual and the Krauses agreed in writing. (Trial Exs. 11, at 7 ¶ 6; 12, at 2 ¶ F.) There is no evidence in the record, however, that Washington Mutual and the Krauses agreed in writing to delete the occupancy requirement. Moreover, the Bankruptcy Court based its conclusion on the Uniform Residential Loan Application on which both Cecilia and Timothy checked the box indicating that they intended to occupy the Itasca Property as their primary residence. (Trial Ex. 8, at 3.) As such, this argument is without merit.

### B. Intent to Deceive or Defraud

In concluding that both of the Krauses' conduct fulfilled the second non-dischargeability element under § 523(a)(2)(A), namely, that the Krauses possessed an intent to deceive or

9

defraud, the Bankruptcy Court examined the Krauses' trial testimony. Timothy Krause testified that he did not understand that he was required to inform Washington Mutual of the Itasca Property sale, despite the due-on-sale clause. He also testified that his attorney told him after the March 2006 closing — at which he received a check for $790,367.71, although he anticipated a profit of merely $230,000 — that the Krauses need not pay off the Washington Mutual mortgage. The Krauses' attorney, however, testified otherwise, and the Bankruptcy Court rejected the Krauses' defense that they were shielded by their counsel's advice, even if counsel had given any such advice. *See Cannon–Stokes v. Potter*, 453 F.3d 446, 449 (7th Cir. 2006) ("bad legal advice does not relieve the client of the consequences of her own acts.").

Cecilia Krause, on the other hand, testified at trial that in their prior dealings, they had always paid off the mortgage loans when they sold the attendant properties. When asked whether the mortgage loan from Washington Mutual was an exception to this practice, Cecilia chose not to respond to the question. Based on her refusal to respond, the Bankruptcy Court reasonably inferred that Cecilia was aware of the Krauses' obligation to pay off the loan or at least notify Washington Mutual of the sale. In examining the Krauses' testimony at the bench trial, the bankruptcy judge stated that their "explanations and excuses [are] implausible and their testimony belied by the contemporaneous documents they executed and by their actions prior, during and after the Sale Closing."

The Bankruptcy Court further noted that despite receiving a windfall of more than $500,000, the Krauses did not inform Washington Mutual of the Itasca Property sale for over three years, nor did they make an effort to remit this windfall to Washington Mutual. Rather, the court concluded that the Krauses actively concealed the fact of the sale by making monthly

payments on the Note for over three years after the March 2006 closing. Reviewing the Krauses' entire course of conduct, the Bankruptcy Court concluded that the Krauses intentionally continued to make the mortgage payments to conceal the sale of the Itasca Property to prevent Washington Mutual from accelerating the terms of the Note. In support of this conclusion, the bankruptcy judge relied on the Krauses' experience with the financing necessary to conduct their general contracting business and their obligations under the due-on-sale clause in their mortgage. The Bankruptcy Court further noted that, at trial,

> [Timothy Krause] did not express surprise, or guilt, or a desire to return the windfall, even though he knew or should have known that he owed over half a million dollars to Washington Mutual. Instead, he testified his reaction upon receiving the windfall was merely that this was "a business day for us." Nor did the passage of time change either Debtor's attitude. Despite having received a windfall of over half a million dollars more than they had anticipated, the Debtors did not inform Washington Mutual of the sale for over three years, nor did they ever make any effort to remit the windfall to Washington Mutual.

(Bankr. R. 43, Mem. Op., at 16-17.)

On appeal, the Krauses argue that because Cecilia Krause did not attend the March 2006 closing nor sign any of the closing documents, there was no basis for the Bankruptcy Court to conclude that Cecilia had the requisite knowledge and intent to deceive or defraud. This argument is misplaced because the duty on both Timothy and Cecilia to disclose the sale of the Itasca Property was triggered by the due-on-sale provision of the 2005 Note, which Cecilia Krause signed, from any papers signed at the March 2006 closing. Further, it is reasonable to infer from Cecilia's trial testimony based on Nevelco's previous sales, that she was aware that the loan amount was due once they sold the Itasca Property.

In addition, the Krauses point to the fact that the Washington Mutual mortgage was not properly recorded, arguing that this excuses them from their obligations under the Note. The

11

Bankruptcy Court concluded that under Illinois law, a lender's failure to record a mortgage does not render the mortgage or underlying note invalid or unenforceable. *See Haas v. Sternback,* 156 Ill. 44, 54 (1894). The Krauses do not cite any controlling legal authority stating otherwise and the Court could not find any. In fact, the Illinois recording statute, 765 ILCS 5/28, does not create a mandatory duty to record a mortgage. *See Union County, Ill. v. MERSCORP, Inc.,* 735 F.3d 730, 734 (7th Cir. 2013) ("Illinois courts also uphold the validity of unrecorded mortgage assignments, deeds, or related instruments."). Hence, the Krauses' argument that the mortgage was invalid is without merit.

Next, the Krauses rely on the Supreme Court's decision in *Field v. Mans,* 516 U.S. 59 (1995), arguing that "[i]t was conceded in *Field* that absent the misrepresentations about not selling the property," it "would have been an ordinary breach of contract case." (R. 11, Open. Brief, at 13.) Despite their argument to the contrary, the Supreme Court's decision in *Field* supports the Bankruptcy Court's ruling. To clarify, the facts in *Field* are similar to the facts in this case, namely, a sale of real estate triggered a due-on-sale clause of the relevant mortgage, the borrower failed to inform the lender of the sale, and the lender did not learn of the sale until over three years later. *See id.* at 61-63. The lower courts concluded that the debt was non-dischargeable under § 523(a)(2)(A). *See id.* at 62-63. After clarifying that the justifiable reliance standard controlled the lower courts' analyses instead of the reasonable reliance standard, the *Field* Court remanded the matter, after which the First Circuit held that non-disclosure of the sale in the context of the due-on-sale clause constituted a fraudulent non-disclosure. *See Field v. Mans*, 157 F.3d 35, 44 (1st Cir. 1998). Accordingly, the Supreme

Court's *Field* decision does not support the Krauses' arguments under the circumstances.[1]

Further, the Krauses point to various documents in the record in support of their argument that Timothy did not make any knowing misrepresentations, including the November 2005 HUD-1 Settlement Statement, the March 2006 closing statement, and the Illinois Real Estate Transfer Declaration, among other documents. (Trial Exs. 9, 19, 45.) That these documents do not support the Bankruptcy Court's conclusion that Timothy failed to inform Washington Mutual of the Itasca Property sale and concealed the sale of the property from Washington Mutual is of no moment because the judge relied upon the Krauses' duties and obligations under the Note, along with trial testimony, in making its determination. In sum, this argument does not establish that the Bankruptcy Court's factual findings were clearly erroneous, especially in light of the court's thorough credibility determinations. *See In re Herman*, 737 F.3d at 455; Fed.R.Bankr.P. 8013.

C.      **Justifiable Reliance**

Next, the Court turns to the third non-dischargeability element under § 523(a)(2)(A) — whether Washington Mutual justifiably relied on the Krauses' false representations. "Justifiable reliance is a less demanding standard than reasonable reliance; it requires only that the creditor did not 'blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *Ojeda,* 599 F.3d at 717 (quoting *Field*, 516 U.S. at 71). Moreover, "[u]nder the justifiable reliance standard, a creditor has no duty to investigate unless the falsity of the representation would have been

---

[1] The Court notes that the *Fields* decision concerned the separate § 523(a)(2)(A) ground of actual fraud, not false representation, as in this matter.

readily apparent." *Id.*

In concluding that Washington Mutual justifiably relied on the Krauses' false representations, the bankruptcy judge stated:

> The Court finds that the Debtors' failure to disclose the sale of the Property was a material misrepresentation and the cause in fact of Washington Mutual's extension of credit and continuance of the financing arrangement with the Debtors. In examining the circumstances of the instant matter, the Court finds that because the Debtors continued to make payments on the Mortgage for three years after selling the property to the Beckers, Washington Mutual was justified in relying on the misrepresentation that its loan was still secured by the Property. The Court further finds that, without notice of the sale, Washington Mutual would have had no reason to exercise its right under the Mortgage to accelerate the loan before the Debtors' conduct came to light in 2009.

(R. 43, Mem. Op., at 19.)

The Krauses first argue that Washington Mutual did not rely on their misrepresentations because no one from Washington Mutual testified at the April 2014 bench trial. "[T]he justifiable reliance standard is not an objective one," but "[r]ather, it is determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff." *Ojeda*, 599 F.3d at 717 (citing *Field*, 516 U.S. at 71-72). The Bankruptcy Court, relying on the trial testimony and exhibits, drew reasonable inferences in concluding that the reason Washington Mutual did not exercise its acceleration rights under the mortgage in March 2006 was because the Krauses did not inform it that they had sold the Itasca Property. The fact that no one from Washington Mutual testified at trial does not make the bankruptcy judge's factual findings clearly erroneous nor its detailed reasoning untenable under the controlling legal authority.

The Krauses further assert that this is merely a breach of contract case arguing that it was Washington Mutual's and/or its agent's negligence in not recording the mortgage that caused the problems. First, as discussed above, whether the mortgage was properly recorded does not

14

change the validity of the mortgage and that the Krauses had duties and obligations under the mortgage and Note. *See Union County, Ill.,* 735 F.3d at 734. Second, the Krauses' attempt to blame Washington Mutual for its loss of over $500,000 — in the context of their $500,000 windfall procured by concealing the sale of the Itasca Property — does not save the day.

Accordingly, the Bankruptcy Court's conclusion that National Union established, by a preponderance of the evidence, that the Krauses' failure to disclose the sale of the Itasca Property was a material misrepresentation and the cause of Washington Mutual's extension of credit and continuance of the financing arrangement, along with Washington Mutual's justifiable reliance that the Note was secured by the Itasca Property, was not clearly erroneous.

## II. Count II — Willful and Malicious Conversion under 11 U.S.C. § 523(a)(6)

As an alternative and independent basis for its decision, the Bankruptcy Court concluded that National Union established — by a preponderance of the evidence — the non-dischargeability requirements of § 523(a)(6). "Under § 523(a)(6), a debtor's debt may not be discharged if he willfully and maliciously injured the plaintiff or the plaintiff's property." *Gambino*, 757 F.3d at 607; *see also In re Smith*, 582 F.3d 767, 771 (7th Cir. 2009). To establish non-dischargeability under § 523(a)(6), a plaintiff must show that: (1) the debtor caused an injury; (2) the debtor's actions were willful; and (3) the debtor's actions were malicious. *See First Weber Group,* 738 F.3d at 774. "[A] willful and malicious injury [] is one that the injurer inflicted knowing he had no legal justification and either desiring to inflict the injury or knowing it was highly likely to result from his act." *Jendusa-Nicolai,* 677 F.3d at 324. "The question whether an actor behaved willfully and maliciously is one of fact." *First Weber Group,* 738 F.3d at 776.

15

In its Adversary Complaint, National Union based its § 523(a)(6) claim on the tort of conversion. In Illinois, the elements of conversion include: "(1) an unauthorized and wrongful assumption of control, dominion, or ownership by defendant over plaintiff's personalty; (2) plaintiff's right in the property; (3) plaintiff's right to the immediate possession of the property, absolutely and unconditionally; and (4) a demand for possession of the property." *Cohen v. American Sec. Ins. Co.,* 735 F.3d 601, 614 (7th Cir. 2013) (citation omitted).

Under this standard, the Bankruptcy Court concluded that the mortgage and Note defined Washington Mutual's rights in the Itasca Property and the due-on-sale clause gave Washington Mutual an immediate right to the proceeds — to the extent of the balance due under the Note — of any sale of the Itasca Property. The Bankruptcy Court further found that instead of remitting the Itasca Property sale proceeds to Washington Mutual after the March 2006 closing, Timothy Krause deposited the proceeds check for $790,367.71 into a Nevelco account at Itasca Bank, and on March 16, 2006, transferred $460,000 of that amount to his personal A.G. Edwards account. Based on these facts, the Bankruptcy Court concluded that by retaining the entire amount of the sales proceeds, the Krauses exercised unauthorized and wrongful assumption of control, dominion, and ownership of Washington Mutual's property.

Furthermore, the Bankruptcy Court concluded that the Krauses exhibited willful and malicious conduct through a series of deliberate and purposeful acts, including (1) failing to notify Washington Mutual that they had sold the Itasca Property, (2) failing to inform the parties involved in the sale of the Itasca Property about the Washington Mutual mortgage, (3) retaining the full amount of the sale proceeds, (4) depositing the sale proceeds into a Nevelco account; (5) transferring $460,000 of the proceeds to their personal A.G. Edwards account; and (6)

concealing the disposition of the property from Washington Mutual by continuing to make monthly mortgage payments until they defaulted in 2009. Also, the court found that the Krauses' conduct was malicious and committed without just cause or excuse due to their blatant disregard of their duty to notify Washington Mutual of the sale of the Itasca Property and their active concealment of the sale by making monthly mortgage payments for three years.

On appeal, the Krauses argue that because the Itasca Property was Nevelco's corporate property, they did not commit a deliberate injury to Washington Mutual. It is undisputed, however, that both Cecilia and Timothy Krause personally signed the Note, thus obligating them to abide by its terms. Moreover, although they also signed certain documents attendant to the mortgage and Note as trustees, neither was a trustee to the land trust, rather Itasca Bank was. Even if the Krauses were acting as corporate officers on behalf of Nevelco, the debt at issue is non-dischargeable because,"[i]t is well established that corporate officers who actively participate in the commission of fraudulent or tortious conduct may be held personally liable." *In re Jacobs,* 448 B.R. 453, 468 (Bankr. N.D. Ill. 2011); *see also GMAC, LLC v. Hillquist,* 652 F.Supp.2d 908, 921 (N.D. Ill. 2009) (under Illinois law, "[c]orporate officers are personally liable for the torts of the corporation if the officer actively participated in the tort."). Therefore, the Krauses' argument that they did not directly cause a deliberate injury to Washington Mutual is unavailing.

Further, the Krauses assert that by admitting the evidence of Timothy Krause's personal A.G. Edwards account, namely, trial exhibit 67, the bankruptcy judge abused his discretion because National Union did not produce this exhibit during discovery. Although the Krauses objected to the use of exhibit 67 at trial, they based their objection on the fact that it was not on

17

the pre-trial exhibit list. The bankruptcy judge nevertheless overruled the objection and allowed counsel to use the exhibit for impeachment purposes. Thereafter, counsel used the document to impeach Cecilia Krause's earlier testimony that neither she nor Timothy placed the Itasca Property sale proceeds in a personal account. Accordingly, not only is the Krauses' appellant argument based on the failure to disclose exhibit 67 during discovery waived — and factually baseless because National Union did produce exhibit 67 during discovery — but the bankruptcy judge did not abuse its discretion in admitting exhibit 67, especially in light of Timothy's trial testimony identifying exhibit 67 as his account named "Timothy D. Krause Real Estate 2 Acct." *See Holder v. IDOC,* 751 F.3d 486, 493 (7th Cir. 2014) (under abuse of discretion standard, reviewing court gives special deference to lower court's findings reversing only when "no reasonable person could take the view adopted by the trial court") (citation omitted). In sum, the Bankruptcy Court did not abuse its discretion in admitting exhibit 67 into evidence.

The Krauses' arguments that Cecilia's conduct was not tortious because her primary job was raising her children, not working as Nevelco's secretary, is belied by the undisputed fact that she was a 50% owner of Nevelco and that her responsibilities included bookkeeping, paying the bills, and balancing the checkbook. Cecilia was also the co-signator on both the Note and accompanying mortgage. Finally, the Krauses' reliance on counsel's advice as a defense to their tortious conduct fares no better. *See Cannon–Stokes*, 453 F.3d at 449; *Cf. In re Crawley,* 244 B.R. 121, 130 (Bankr. N.D. Ill. 2000) ("This defense undermines the basic principle that the law should generally be adhered to despite any bad advice not to comply with it.").

Finding no error of fact or law, the Court affirms the Bankruptcy Court's judgment as to National Union's claim brought pursuant to § 523(a)(6).

## CONCLUSION

For the stated reasons, the Court affirms the Bankruptcy Court's judgment.

**Dated:** September 30, 2014

**ENTERED:**

_____
**AMY J. ST. EVE**
**United States District Court Judge**